# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



MARS, INCORPORATED, ETHEL M.
CHOCOLATES, INC., SEEDS OF CHANGE,
INC., d/b/a SUSTAINABLE AGRICO, L.L.C.,
AND WAL-MART STORES, INC.,

           PLAINTIFFS,

    v.

STONE CONTAINER CORP., JEFFERSON
SMURFIT CORP., SMURFIT-STONE
CONTAINER CORP., INTERNATIONAL
PAPER CO., GEORGIA-PACIFIC CORP.,
WEYERHAEUSER PAPER CO.,
TEMPLE-INLAND INC., GAYLORD
CONTAINER CORP., UNION CAMP CORP.,
PACTIV CORP. (f/k/a TENNECO
PACKAGING, INC.), PACKAGING
CORPORATION OF AMERICA, AND
SIMPSON TACOMA KRAFT CO.,

           DEFENDANTS.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

03C 6977

JUDGE COAR

MAGISTRATE JUDGE DENLOW

OCT - 3 2003

## COMPLAINT

### JURY TRIAL DEMANDED

Plaintiffs Mars, Inc., Ethel M. Chocolates, Inc., Seeds of Change, Inc., Wal-Mart Stores, Inc., and their respective affiliates, subsidiaries, divisions and predecessors-in-interest, as stated in Attachment A, bring this civil action against the foregoing defendants for injunctive relief and treble damages arising out of defendants' violations of the antitrust laws of the United States, and demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure and allege the following:

1647281 v2; ZB1T02!.DOC

NATURE OF THE CASE

1. Plaintiffs and/or their subsidiaries, affiliates, divisions, and predecessors-in-interest (collectively "Plaintiffs") are major purchasers of corrugated containers and, in some cases, sheets (hereinafter referred to as "corrugated material").

2. Plaintiffs were members of two certified classes of purchasers of corrugated material on whose behalf a series of actions were initiated starting in June 1998. Those actions have been consolidated for pretrial purposes by the Judicial Panel on Multidistrict Litigation in the Eastern District of Pennsylvania in In re Linerboard Antitrust Litigation, MDL Docket No. 1261. On September 4, 2001, the Eastern District of Pennsylvania granted each class' motion for certification and certified a Box Class and Sheet Class, 203 F.R.D. 197, aff'd, 305 F.3d 145 (3d Cir. 2002), cert. denied, 2003 U.S. LEXIS 2960 (April 21, 2003). On April 24, 2003, the Notice of Class Action Determination, Proposed Partial Settlement and Final Approval was issued. Pursuant to the Notice, on June 9, 2003, Plaintiffs requested exclusion from the certified classes.

3. This antitrust action arises out of a combination and conspiracy among Defendants and their co-conspirators to, inter alia, fix, raise, maintain and stabilize the prices at which corrugated material was sold in the United States and elsewhere from at least mid-1993 and continuing through at least November 1995, the exact dates being unknown to Plaintiffs. In furtherance of their unlawful combination and conspiracy, Defendants agreed to reduce the inventory supply of linerboard through, among other things, coordinated and sequenced downtime at their respective linerboard manufacturing facilities. In addition, Defendants combined and conspired to fix the prices of corrugated material through a series of agreed price increases of linerboard. Because of the continuous unlawful conduct of the Defendants in the United States,

2

including within this District, and elsewhere, Plaintiffs paid artificially inflated prices for corrugated material that it purchased from Defendants from at least October 1993 until at least February 1997 ("the relevant period").

JURISDICTION AND VENUE

4. This Complaint is filed and these proceedings are instituted under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15, 26) to obtain injunctive relief and to recover treble damages and the costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs by reason of Defendants' and their co-conspirators' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as well as under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

6. Each Defendant maintains an office or agent, transacts business or is found within the Northern District of Illinois, and each Defendant is within the jurisdiction of this Court for purposes of service. The interstate commerce described in this complaint was carried out, in part, within the Northern District of Illinois. Defendants performed unlawful acts in furtherance of their unlawful combination and conspiracy within the Northern District of Illinois and elsewhere that were intended to affect and did affect Plaintiffs and others located within the Northern District of Illinois. This action may be brought in this District pursuant to Sections 4 and 12 of the Clayton Act (U.S.C. §§ 15, 22) and 28 U.S.C. § 1391. Personal jurisdiction exists over all Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. §22) and the Illinois Long-Arm Statute (735 ILCS §5/2-209).

## PLAINTIFFS

7.  Plaintiff Mars, Inc. is a Delaware corporation, with its principal place of business in McLean, Virginia. Mars, Inc., through its divisions, and predecessors-in-interest including, but not limited to Masterfoods USA, a division of Mars, Inc., f/k/a M&M/Mars, a division of Mars, Inc., Uncle Ben's, Inc., Kal Kan Foods, Inc., and M&M/Mars, Inc., (collectively "Mars") purchased substantial quantities of corrugated material from one or more of the Defendants during the relevant period and was injured by Defendants' antitrust violations alleged herein.

8.  Plaintiff Ethel M. Chocolates, Inc. is a Delaware corporation with its principal place of business in Hackettstown, New Jersey. Plaintiff Ethel M. Chocolates, Inc. purchased substantial quantities of corrugated material from one or more of the Defendants during the relevant period and was injured by Defendants' antitrust violations alleged herein.

9.  Plaintiff Seeds of Change, Inc., d/b/a Sustainable Agrico, L.L.C. ("Seeds of Change") is a New Mexico corporation with its principal place of business in Santa Fe, New Mexico. Plaintiff Seeds of Change purchased substantial quantities of corrugated material from one or more of the Defendants during the relevant period and was injured by Defendants' antitrust violations alleged herein.

10.  Plaintiff Wal-Mart Stores, Inc. is a Delaware corporation, with its principal place of business in Bentonville, Arkansas. Wal-Mart Stores, Inc., including its subsidiaries, affiliates, predecessors-in-interest and assigns (collectively "Wal-Mart"), purchased substantial quantities of corrugated material from one or more of the Defendants during the relevant period and was injured by Defendants' antitrust violations alleged herein.

DEFENDANTS

11.  Defendant Stone Container Corp. ("Stone Container") is a Delaware corporation with its principal place of business in Chicago, Illinois.  During the relevant period, Stone Container manufactured and sold linerboard, and manufactured and sold corrugated sheets and containers to purchasers in the United States and elsewhere.  In November 1998, Defendant Jefferson Smurfit Corp. and Defendant Stone Container merged to form Defendant Smurfit-Stone Container Corp. ("SSCC").

12.  Defendant Jefferson Smurfit Corp. ("Jefferson Smurfit") is a Delaware corporation with its principal place of business in St. Louis, Missouri.  During the relevant period, Jefferson Smurfit manufactured and sold linerboard, and manufactured and sold corrugated sheets and containers to purchasers in the United States and elsewhere.  In November 1998, Defendant Jefferson Smurfit and Defendant Stone Container merged to form Defendant SSCC.

13.  Defendant Smurfit-Stone Container Corp. ("SSCC") is a Delaware corporation with principal places of business in Chicago, Illinois and Clayton, Missouri. Defendant SSCC was formed in November 1998 by a merger of Defendant Stone Container and a subsidiary of Defendant Jefferson Smurfit.  Upon information and belief, Plaintiffs allege that Defendant SSCC is the successor in interest to Defendants Stone Container and Jefferson Smurfit, and is liable for the actions of Defendants Jefferson Smurfit and Stone Container as alleged in this Complaint.

14.  Defendant International Paper Co. ("International Paper") is a New York corporation with its principal place of business in Purchase, New York.  During the relevant time period, International Paper manufactured and sold linerboard, and manufactured and sold corrugated sheets and containers to purchasers in the United States and elsewhere.  Effective April 30, 1999, Defendant International Paper acquired

5

and merged with Defendant Union Camp Corp. Upon information and belief, Plaintiffs allege that Defendant International Paper is the successor in interest to Defendant Union Camp Corp., and is liable for the actions of Defendant Union Camp Corp. as alleged in this Complaint.

15. Defendant Georgia-Pacific Corp. ("Georgia-Pacific") is a Georgia corporation with its principal place of business in Atlanta, Georgia. During the relevant period, Georgia-Pacific manufactured and sold linerboard, and manufactured and sold corrugated sheets and containers to purchasers in the United States and elsewhere.

16. Defendant Weyerhaeuser Paper Co. ("Weyerhaeuser") is a Washington corporation with its principal place of business in Federal Way, Washington. During the relevant time period, Weyerhaeuser manufactured and sold linerboard, and manufactured and sold corrugated sheets and containers to purchasers in the United States and elsewhere.

17. Defendant Temple-Inland Inc. ("Temple-Inland") is a Delaware corporation with its principal place of business in Diboll, Texas. At all relevant times, Temple-Inland manufactured and sold linerboard, and manufactured and sold corrugated sheets and containers to purchasers in the United States and elsewhere. On April 5, 2002, Defendant Gaylord Container Corp. became a wholly-owned subsidiary of Defendant Temple-Inland.

18. Defendant Gaylord Container Corp. ("Gaylord") is a Delaware corporation with its principal place of business in Deerfield, Illinois. At all relevant times, Gaylord manufactured and sold linerboard, and manufactured and sold corrugated sheets and containers to purchasers in the United States and elsewhere. On April 5, 2002, Defendant Gaylord became a wholly-owned subsidiary of Defendant

6

Temple-Inland.

19. Defendant Union Camp Corp. ("Union Camp") is a Virginia corporation with its principal place of business in Wayne, New Jersey. During the relevant time, , Union Camp manufactured and sold linerboard, and manufactured and sold corrugated sheets and containers to purchasers in the United States and elsewhere. Effective April 30, 1999, Defendant Union Camp. was acquired by Defendant International Paper.

20. Defendant Pactiv Corp., f/k/a/ Tenneco Packaging, Inc. ("Pactiv"), also formerly known as Packaging Corp. of America ("PCA"), is a Delaware corporation with its principal place of business located in Lake Forest, Illinois. During the time period relevant to this action, PCA and Tenneco Packaging manufactured and sold linerboard, corrugated containers, and related corrugated products to purchasers in the United States and elsewhere. PCA changed its name to Tenneco Packaging in 1995. Tenneco Packaging later changed its name to Pactiv Corporation. In 1999, Pactiv Corporation sold its linerboard and corrugated packaging business to a newly formed entity called Packaging Corporation of America.

21. Defendant Packaging Corporation of America ("PCA") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. Defendant PCA is the successor in interest to defendant Pactiv (f/k/a Tenneco Packaging, Inc.), having maintained continuity of operations since acquiring the linerboard and corrugated packaging business of Pactiv. Thus, defendant PCA is legally responsible for the pre-acquisition acts of defendants Pactiv and Tenneco Packaging alleged herein.

22. Defendant Simpson Tacoma Kraft Co. ("Simpson") is a Washington corporation with its principal place of business in Tacoma, Washington. During the

7

relevant period, Simpson manufactured and sole linerboard, and manufactured and sole corrugated containers in the United States and elsewhere.

23. The acts charged in this Complaint as having been done by Defendants were authorized, ordered, or done by their officers, directors, agents, employees, or representatives, while actively engaged in the management of Defendants' businesses or affairs.

24. Various other individuals, companies, corporations, partnerships, associations, and other entities, the identities of which are presently unknown and which are not named as Defendants in this action, may have participated as co-conspirators with Defendants in the violations alleged herein, and have performed substantial acts and made statements in the Northern District of Illinois in furtherance thereof. All references to "Defendants" include the named entities as well as these unknown individuals, companies, corporations, partnerships, associations, and other entities.

## TRADE AND COMMERCE

25. During the relevant period, the Defendants manufactured linerboard and produced, distributed and sold corrugated material in a continuous and uninterrupted flow of interstate commerce.

26. Linerboard is a type of paperboard that is suitable for use in the production of corrugated material, including in particular corrugated sheets, which are in turn used in the manufacturing of corrugated boxes.

27. The corrugated sheet and container industry is a multibillion dollar, international business. During the relevant time period, annual sales of corrugated material in the United States exceeded $50 billion.

28. "Single-wall" corrugated sheets are made by gluing a fluted piece of paperboard, known as the corrugated medium, between facing sheets of linerboard; corrugated sheets can also be referred to as containerboard. Corrugated sheets may also be "double-wall," or even "triple-wall," although approximately 90% of boxes are single-wall construction.

29. Corrugated sheets are used in the manufacture of corrugated containers, or boxes. Corrugated containers are generally viewed as interchangeable in that most manufacturers are able to supply the product needs of most customers.

30. Defendants are major vertically integrated manufacturers and sellers of linerboard, corrugated sheets, and corrugated containers. Most of the Defendants utilize over 80% of the linerboard they manufacture internally to produce corrugated sheets and containers that they sell to entities like Plaintiffs. Defendants were the largest suppliers of corrugated sheets and containers during the relevant period.

31. Because linerboard is the primary ingredient utilized in the manufacture of corrugated sheets and because corrugated sheet costs are the majority of the final price of corrugated containers, changes in the prices of corrugated sheets and containers are directly related to changes in the price of linerboard. Levels of linerboard production and supply bear directly upon both their pricing and price movements.

32. Defendants' illegal conduct both within the United States and elsewhere directly affected the flow of interstate trade and commerce. In particular, as a result of their unlawful combination and conspiracy, Defendants (a) eliminated or suppressed competition in the production, distribution and sale of corrugated materials and (b) inflated the prices that Plaintiffs and others paid for corrugated material in the United States and elsewhere.

9

33. By engaging in conduct which artificially manipulated the supply of and artificially fixed, raised, maintained and stabilized the price of linerboard, Defendant manufacturers manipulated and artificially fixed, raised, maintained and stabilized the prices for corrugated sheets and containers that they manufactured and sold.

THE CONSPIRACY

34. From at least mid-1993 and continuing through at least November 1995, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing combination, conspiracy and agreement in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

35. This combination and conspiracy consisted of an agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms, and/or the purpose of which was to raise, stabilize and maintain at artificially high levels the prices of corrugated sheets and containers throughout the United States and elsewhere.

36. For the purpose of forming and effectuating their combination and conspiracy, Defendants and their co-conspirators, among other things, discussed, formed and implemented agreements to reduce inventories, including restricting production of linerboard by, among other means, coordinating downtime at their respective linerboard manufacturing plants. In addition, Defendants and their co-conspirators discussed, formed and implemented agreements to raise, stabilize and maintain prices for linerboard.

37. From 1990 to the third quarter of 1993, the price of the most common grade of linerboard (standard grade kraft linerboard, 42lb per 1000 square feet) declined

10

approximately 29% from approximately $410 to about $290/ton.

38. In January 1993, on the heels of two failed price increases in the summer and fall of 1992, Defendant Stone Container and other manufacturers of linerboard, including Defendants Georgia-Pacific, International Paper, PCA and Union Camp announced a $30/ton increase in the price for all grades of linerboard, to take effect in March. Weyerhaeuser and Temple-Inland did not announce a price increase. This attempt to increase the price of linerboard failed. Defendant Stone Container blamed, in part, the hold-outs, Weyerhaeuser and Temple-Inland, for this failure.

39. In or about mid-1993, the exact date being unknown to Plaintiffs, for the purpose of forming and effectuating their illegal combination and conspiracy, executives of Defendant Stone Container, acting in concert with executives from other major producers of corrugated materials, conspired, combined and agreed to reduce the inventory supply of linerboard for the specific purpose of increasing prices of corrugated materials.

40. In furtherance of their unlawful combination and conspiracy, Defendants, in or around late June and early July 1993, in response to a telephone survey conducted by Defendant Stone Container, exchanged information with Defendant Stone Container regarding how much linerboard was available to purchase and at what price. There was no legitimate business purpose for these communications.

41. In or around July 1993, the exact dates being unknown to Plaintiffs, senior officers of Stone Container, in furtherance of their unlawful combination and conspiracy, contacted their high-ranking counterparts at the other major linerboard producers to inform them of Stone Container's intention to draw down industry levels by a) taking downtime at six of its linerboard manufacturing facilities, thus removing

180,000 to 240,000 tons of its linerboard production -- approximately 6% of its annual output, and b) arranging for and agreeing to the purchase of approximately 100,000 tons of linerboard from the other major linerboard manufacturers, rather than meeting its linerboard requirements from its own internal production. It was unusual for these high-level executives to participate in these types of conversations. The purpose of these communications was to coordinate industry-wide restrictions on output and price increases in furtherance of the conspiracy.

42. There was no legitimate business purpose for Stone Container to either take this extraordinary downtime or fulfill its linerboard requirements by purchasing from other linerboard manufacturers. Defendant Stone Container acknowledged that the cost to the company of its extraordinary downtime was approximately $25 million.

43. As a result of these communications and in furtherance of the conspiracy, the major manufacturers, including Defendants, committed to removing, in total, almost 500,000 tons of linerboard from production.

44. Starting in August 1993, Defendants, as planned and agreed, and in furtherance of their unlawful combination and conspiracy, began to take production downtime. This downtime was taken at a time when demand in the industry was increasing. It would come to be known as the single largest voluntary reduction in output in the history of the U.S. linerboard industry.

45. Beginning in or about the third quarter of 1993 and continuing thereafter, through at least November 1995, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators, in furtherance of their unlawful combination and conspiracy, had additional communications with each other that had no legitimate business purpose, during which they agreed or reached mutual understandings to

12

coordinate and implement price increases on linerboard, thereby leading to an increase in the price of corrugated sheets and containers in the United States and elsewhere.

46.  For example, in August 1993, Defendant Stone Container, in furtherance of the conspiracy, announced the first of a series of linerboard price increases that took place during the next 18 months.  As planned and agreed, the August price increase, effective October 1, 1993, was joined by virtually every major manufacturer, including all Defendant manufacturers.

47.  Subsequently, pursuant to their unlawful agreement, the major manufacturers, including Defendants herein, continued their pattern of taking substantial downtime and implementing unprecedented price increases of linerboard, all in furtherance of the conspiracy.  Upon information and belief, coordinated price increases of linerboard were announced or implemented, at least, in or about December 1993, January 1994, May 1994, October 1994, and April 1995.

48.  By April 1995, the price of linerboard was approximately $525/ton.

49.  As a result of the foregoing, prices for linerboard and thus the prices for corrugated sheets and containers were artificially raised, fixed, maintained and stabilized in violation of Section 1 of the Sherman Act.

## EFFECTS OF THE COMBINATION AND CONSPIRACY

50.  The purpose and effect of Defendants' unlawful combination and conspiracy were to fix, raise, maintain and stabilize the prices that Plaintiffs and others paid for corrugated material, to deprive Plaintiffs and others of the benefit of free and open competition in their purchases of corrugated material, and to restrain, suppress and eliminate competition in the production, distribution and sale of corrugated material.

1647281 v2; Z81T02!.DOC

51. By reason of the alleged violations of the antitrust laws, Plaintiffs paid more for corrugated material than it would have paid in the absence of the illegal combination and conspiracy. As a direct and proximate result, Plaintiffs have been injured in its business and property and has suffered damages in an amount presently undetermined.

<u>FRAUDULENT CONCEALMENT AND TOLLING</u>

52. Plaintiffs hereby re-allege each of the foregoing allegations of this Complaint as if fully set forth herein.

53. The statute of limitations in this action was suspended pursuant to 15 U.S.C. § 16(i) by reason of a proceeding brought by the United States through the Federal Trade Commission against Stone Container, which action was pending at least until June 23, 1998. Soon after the FTC filed its complaint, several lawsuits were filed against Stone on behalf of putative classes of purchasers of corrugated sheets and corrugated boxes. Stone was the only defendant named in these cases, but plaintiffs alleged that there were unnamed co-conspirators. The filing of these class action lawsuits, now coordinated as MDL 1261, tolled the statute of limitations for all class members, including plaintiffs herein.

54. Plaintiffs had no knowledge of the identity of Stone's co-conspirators involved in the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, until approximately May 14 and 18, 1999, when an amended complaint was filed on behalf of a putative class of purchasers of corrugated boxes and a new complaint was filed on behalf of a putative class of purchasers of corrugated sheets, reflecting the plaintiffs' discovery of the identity of Stone's co-conspirators through documents produced by

14

Stone, and naming for the first time the additional defendants named in this Complaint. As to these additional defendants, these filings in MDL 1261 tolled the statute of limitations for all class members, including plaintiffs herein. Both classes were subsequently certified. On June 9, 2003, plaintiffs exercised their right to exclude themselves from the MDL 1261 classes.

55. At all relevant times, Defendants and their co-conspirators affirmatively concealed the existence of their illegal combination and conspiracy and thereby tolled the statute of limitations. Plaintiffs did not discover and could not have discovered Defendants' unlawful conduct any earlier than December 1998 by the exercise of due diligence because Defendants and their co-conspirators affirmatively and fraudulently concealed the existence of their combination and conspiracy from Plaintiffs and others by various acts.

56. Plaintiffs had no knowledge of Defendants' wrongful conduct or of any facts that might have led to the discovery thereof, until the Federal Trade Commission disclosed its complaint against Stone Container on February 25, 1998. Plaintiffs had no knowledge of the identity of Defendant Stone Container's co-conspirators involved in the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence until after December 1998, when Stone produced documents to class plaintiffs in the In re Linerboard Antitrust Litigation. Upon information and belief, Defendants, other than Stone Container, have taken extraordinary steps to delay and prevent Plaintiffs from discovering information, and thus have further affirmatively and fraudulently concealed their wrongful conduct. These steps include, but are not limited to, Defendant Weyerhaeuser placing itself in contempt of court rather than abide by an order of a United States District Court to

15

produce documents in response to class plaintiffs' subpoena, and Defendant International Paper discarding, prior to its receipt of class plaintiffs' subpoena, the documents it had previously produced to the Federal Trade Commission.

57. In addition, throughout the relevant time period, Defendants' various affirmative acts of fraudulent concealment which concealed the existence of their illegal combination and conspiracy alleged herein, included, but were not limited to, the following:

a. During the relevant period, Defendants represented publicly and to customers that the reduction in the supply of linerboard was the result of independent unilateral actions by the Defendants. Defendants' explanations were false and/or misleading in that the reduction in the supply of linerboard was, in fact, the result of a highly coordinated and agreed series of steps to reduce the industry's linerboard inventory.

b. During the relevant period, Defendants represented publicly and to customers that the price increases of linerboard and related corrugated material were the result of independent unilateral price actions in response to natural market forces. Again, Defendants' explanations were false and misleading and were intended to conceal Defendants' illegal combination and conspiracy.

c. During the relevant period, Defendants engaged in private, secret communications with each other, including telephone communications, to effectuate the collusive reduction of linerboard supply and the collusive increases in linerboard and related corrugated material prices described herein-above. These secret, conspiratorial communications were, by their very nature, not discoverable by Plaintiffs in the exercise of reasonable diligence.

58.  Because the conspiracy was effectuated by secret means, and Defendant Stone Container and its co-conspirators affirmatively and actively concealed the combination and conspiracy alleged herein, Plaintiffs were unaware of the fact that prices for linerboard and corrugated material had been secretly agreed upon and fixed as alleged herein and could not, with the exercise of reasonable diligence, have discovered the combination and conspiracy alleged herein prior to December 1998.

## INJURY TO PLAINTIFFS

59.  During the relevant period, Plaintiffs purchased substantial amounts of corrugated material from one or more of the Defendants.  As a result of Defendants' *per se* unlawful combination and conspiracy, Plaintiffs were compelled to pay, and did pay, prices for corrugated material that were substantially greater than what Plaintiffs would have paid absent Defendants' illegal conduct.  The full amount of Plaintiffs' damages will be calculated after discovery and upon proof at trial.

## INJUNCTIVE RELIEF

60.  Defendants and their co-conspirators have engaged in a persistent and continuing pattern and practice of antitrust violations that is likely to recur unless each is permanently enjoined from engaging in such unlawful conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the Court to:

a.  Enter judgment declaring that the foregoing combination and conspiracy, and the acts done in furtherance thereof, were an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

1647281 v2; ZB1T02!.DOC

b.  Enter judgment in favor of Plaintiffs and jointly and severally against all Defendants for treble the amount of the jury verdict and for attorneys' fees, costs and prejudgment interest as provided for in Section 4 of the Clayton Act;

c.  Enjoin each of the Defendants from continuing the unlawful conduct alleged herein, and from entering into any other combination, conspiracy or agreement having similar purposes or effects; and

d.  Enter, and retain jurisdiction to enter, such further orders and decrees as may be necessary or appropriate to remedy the injury to Plaintiffs or as the Court deems appropriate.

<u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

18

1647281 v2; ZB1T02!.DOC

Dated:  October __1__, 2003

Respectfully submitted,

DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP

Local Counsel for Plaintiffs:
Michael J. Hayes, Sr.
Gardner Carton & Douglas
191 North Wacker Drive
Suite 3400
Chicago, Il  60606
(312) 569-1000

By: _____
Kenneth L. Adams
R. Bruce Holcomb
Richard J. Leveridge
Elaine Metlin
2101 L Street, NW
Washington, DC  20037-1526
(202) 785-9700
Counsel for Plaintiffs

KING, PAGANO & HARRISON

Steven Schaars
David R. Addis
1730 Pennsylvania Avenue, NW
Suite 900
Washington, DC  20006
(202) 371-6800
Co-counsel for Plaintiffs

C:\TEMP\DSMDB-1647281-v2-Mars complaint2.DOC

1647281 v2; ZB1T02!.DOC

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

## DISCLOSURE STATEMENT FOR PLAINTIFFS

As required by Local Rule 3.2, the following chart identifies the plaintiffs,

parent companies, if any, and any publicly-held company that has a ten percent

(10%) or greater ownership interest in the plaintiffs.

| PLAINTIFF | PARENT COMPANY(IES) | PUBLICLY HELD COMPANY(IES) WITH 10% OR GREATER INTEREST |
|---|---|---|
| Mars, Inc. | None | None |
| Ethel M. Chocolates, Inc. | Mars, Inc. | None |
| Seeds of Change, Inc. d/b/a Sustainable Agrico, L.L.C. | Mars, Inc. | None |
| Wal-Mart Stores, Inc. | None | None |

Dated: October ___, 2003

Respectfully submitted,

DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP

Local Counsel for Plaintiffs:
Michael J. Hayes, Sr.
Gardner Carton & Douglas
191 North Wacker Drive
Suite 3400
Chicago, Il 60606
(312) 569-1000

By: _____
Kenneth L. Adams
R. Bruce Holcomb
Richard J. Leveridge
Elaine Metlin
2101 L Street, NW
Washington, DC 20037-1526
(202) 785-9700
Counsel for Plaintiffs

KING PAGANO & HARRISON
Steven Schaars
David R. Addis
1730 Pennsylvania Avenue, NW
Suite 900
Washington, DC 20006
(202) 371-6800

Co-counsel for Plaintiffs

C:\TEMP\DSMDB-1654642-v1-Mars corporate disclosure statement1.DOC

1654642 v1; ZGQ@01!.DOC

ATTACHMENT A

| COMPANY NAME | SUBSIDIARIES, AFFILIATES, PREDECESSORS, SUCCESSORS, PARTNERS, PARENTS, ASSIGNS, DIVISIONS, AND TRADE/BRAND NAMES |
|---|---|
| **Wal-Mart Stores, Inc.**<br>702 S.W. 8th Street<br>Bentonville, Arkansas 72716-0215 | Wal-Mart Stores East, Inc.<br>Wal-Mart Stores, East, L.P.<br>Sam's East, Inc.<br>Sam's West, Inc. |

Civil Cover Sheet                                                                    Page 1 of 2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet    03C 6977

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

JUDGE COAR

MAGISTRATE JUDGE DENLOW

**Plaintiff(s): MARS, INCORPORATED, ETHEL M. CHOCOLATES, INC., SEEDS OF CHANGE, INC., d/b/a SUSTAINABLE AGRICO, L.L.C., AND WAL-MART STORES, INC.**

**Defendant(s):STONE CONTAINER CORP., JEFFERSON SMURFIT CORP., SMURFIT-STONE CONTAINER CORP., INTERNATIONAL PAPER CO., GEORGIA-PACIFIC CORP., WEYERHAEUSER PAPER CO., TEMPLE-INLAND INC., GAYLORD CONTAINER CORP., UNION CAMP CORP., PACTIV CORP. (f/k/a TENNECO PACKAGING, INC.), PACKAGING CORPORATION OF AMERICA, AND SIMPSON TACOMA KRAFT CO.**

County of Residence:

County of Residence:

Plaintiff's Atty:  Michael J. Hayes, Sr. (and
attached counsel)
Gardner Carton & Douglas
191 N. Wacker Dr. Suite 3400,
Chicago Il. 60606
312 569 1000

Defendant's Atty:

See attachment

OCT - 3 2003

---

II. Basis of Jurisdiction:        **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
                        Plaintiff:- **N/A**
                    Defendant:- **N/A**

IV. Origin :                **1. Original Proceeding**

V. Nature of Suit:            **410 Antitrust**

VI.Cause of Action:        **Sherman Act Section I, Clayton Act Section IV. Plaintiffs allege that
defendants conspired to increase the prices of linerboard and
corrugated boxes.**

VII. Requested in Complaint
            Class Action: **No**
    Dollar Demand: **To be calculated**
        Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: _____ 5/30/03 _____

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**                Revised: 06/28/00

# Civil Cover Sheet Attachment

I.　　　Additional Plaintiff's Counsel

Kenneth L. Adams
R. Bruce Holcomb
Richard J. Leveridge
Elaine Metlin
J. Tara Holubar
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, NW
Washington, DC 20037-1526
(202) 785-9700

II.　　　Additional Defendants' Counsel

Dane Drobney
R. Mark McCareins
Winston & Strawn
35 West Wacker Drive
Chicago, IL 60601


Edward Posner
Paul H. Saint-Antoine
Drinker & Biddle & Reath, LLP
One Logan Square
18th & Cherry Street
Philadelphia, PA 19103-6996


Steven J. Harper
James H. Kurtenbach
James H. Schink
Steven C. Seeger
Timothy A. Duffy
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Daniel Huyett
Stevens & Lee
111 North Sixth Street
P.O. Box 679
Reading, PA 19603-0679

III.    Multidistrict Litigation Status

        Plaintiff will file a Notice of Potential Tag-Along Action before the Judicial
Panel on Multidistrict Litigation in In Re: Linerboard Antitrust Litigation, MDL No.
1261, and expects the Panel to transfer this Action to the Eastern District of
Pennsylvania for consolidated and/or coordinated pretrial proceedings.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

In the Matter of

Mars, Incorporated, et al. v. Stone Container Corp., et al.

Case Number:  

**JUDGE COAR**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Mars, Inc.; Ethel M. Chocolates, Inc.; Seeds of Change, Inc.; Wal-Mart Stores, Inc.

| (A) | (B) |
|---|---|
| SIGNATURE *Richard J. Leveridge (sdh)* | SIGNATURE |
| NAME Richard J. Leveridge | NAME Michael W. Hayes, Sr. |
| FIRM Dickstein Shapiro Morin & Oshinsky LLP | FIRM Gardner Carton & Douglas |
| STREET ADDRESS 2101 L Street NW | STREET ADDRESS 191 North Wacker Dr. Suite 3400 |
| CITY/STATE/ZIP Washington, D.C. 20037 | CITY/STATE/ZIP Chicago, IL 60606 |
| TELEPHONE NUMBER (202) 785-9700   FAX NUMBER (202) 887-0689 | TELEPHONE NUMBER (312) 569-1000   FAX NUMBER (312) 569-3000 |
| E-MAIL ADDRESS leveridger@dsmo.com | E-MAIL ADDRESS mhayes@gcd.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01161725 |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☑ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☑   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☑ |
| | DESIGNATED AS LOCAL COUNSEL?   YES ☑   NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE *Elaine Metlin (sdh)* | SIGNATURE *Tara Holubar (sdh)* |
| NAME Elaine Metlin | NAME Tara Holubar |
| FIRM Dickstein Shapiro Morin & Oshinsky LLP | FIRM Dickstein Shapiro Morin & Oshinsky LLP |
| STREET ADDRESS 2101 L Street NW | STREET ADDRESS 2101 L Street NW |
| CITY/STATE/ZIP Washington, D.C. 20037 | CITY/STATE/ZIP Washington, D.C. 20037 |
| TELEPHONE NUMBER (202) 785-9700   FAX NUMBER (202) 887-0689 | TELEPHONE NUMBER (202) 785-9700   FAX NUMBER (202) 887-0689 |
| E-MAIL ADDRESS metline@dsmo.com | E-MAIL ADDRESS holubart@dsmo.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☑ | MEMBER OF TRIAL BAR?   YES ☐   NO ☑ |
| TRIAL ATTORNEY?   YES ☑   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☑ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☑ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☑ |